# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN VLASICH, | 1:05-cv-01615-LJO-GSA-PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANT FISHBACK'S MOTION FOR SUMMARY JUDGMENT BE GRANTED |
| v. | |
| DR. TIMOTHY FISHBACK, et al., | |
| | (Docs. 124, 125.) |
| Defendants. | OBJECTIONS, IF ANY, DUE IN 20 DAYS |

**I.   RELEVANT PROCEDURAL HISTORY**

Steven Vlasich ("Plaintiff") is a state prisoner in custody of the California Department of Corrections and Rehabilitation ("CDCR"), proceeding pro se and in forma pauperis with this civil rights action pursuant to 42 U.S.C. § 1983. This action now proceeds on the original complaint filed by Plaintiff on December 20, 2005, against defendants Dr. Timothy Fishback, Dr. Jesus Juarez, and Dr. Simon Villa, on Plaintiff's medical claims under the Eighth Amendment.[1]  (Doc. 1.)

On January 25, 2010, defendant Dr. Timothy Fishback ("Defendant") filed a motion for summary judgment. (Docs. 124-130.) On June 15, 2010, Plaintiff filed an opposition. (Doc. 146.) On August 10, 2010, Defendant filed a reply. (Doc. 155.) Defendant's motion is now before the Court.

---

[1] All other claims and defendants were dismissed from this action by the Court on November 5, 2007, for Plaintiff's failure to state a claim. (Doc. 28.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56©. Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56©, is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Fed.R.Civ.P. 56(e); Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 586 n.11 (1986); First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289 (1968); Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed.R.Civ.P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute

is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hosp., 754 F.2d 1420, 1423 (9th Cir. 1985); Fed.R.Civ.P. 56(e). Plaintiff's complaint is verified and will be considered by the Court in resolving Defendant's motion to the extent that it sets forth admissible facts. The parties bear the burden of supporting their motions and oppositions with the papers they wish the court to consider and/or by specifically referring to any other portions of the record they wish the court to consider. Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will not undertake to mine the record for triable issues of fact. Id.

**III.   PLAINTIFF'S ALLEGATIONS AND CLAIMS AGAINST DR. TIMOTHY FISHBACK**

Plaintiff is an inmate housed at California State Prison-Corcoran ("CSP"), where the events at issue in this action allegedly occurred. Plaintiff alleges as follows in the complaint.

Plaintiff was diagnosed with Attention Deficit Disorder ("ADD") as a child and was prescribed the medication Ritalin. On July 13, 2001, Plaintiff was diagnosed with adult Attention Deficit Hyperactivity Disorder ("ADHD") and was prescribed Ritalin. Eight different psychologists diagnosed Plaintiff with ADHD and prescribed the medication Ritalin, and an additional four psychologists also diagnosed Plaintiff with ADHD.

In June and July 2005, Plaintiff's doctors told him that "Sacramento," via Dr. Fishback, CDCR Chief Psychiatrist, had issued a memo proscribing the use of Ritalin for treatment of inmates with ADHD. Afterward, Plaintiff was prescribed the medication Strattera to treat his ADHD; however, Plaintiff suffered serious side effects on Strattera and his prescription was discontinued on August 12, 2005.

Plaintiff filed grievances at the prison about being denied Ritalin and requested a renewed prescription for Ritalin from his doctors. Dr. Juarez told Plaintiff that Dr. Fishback threatened

him verbally with insubordination if he allowed any doctor at CSP to prescribe Ritalin, and that he would prescribe Ritalin for Plaintiff if not for the threats. Dr. Juarez also told Plaintiff that three other inmates at CSP were still taking Ritalin. Plaintiff developed anxiety and depression and was prescribed Effexor and Prozac, but he was not given any treatment for ADHD.

Dr. Fishback wrote Plaintiff two letters dated October 4, 2005 and November 7, 2005, erroneously stating that Plaintiff had been advised that Ritalin is a non-formulary medication and is no longer prescribed unless approved by the Health Care Manager on an individual basis, and that other comparable medications were available and could be prescribed by Plaintiff's physician.

As a result of the discontinuation of Ritalin, Plaintiff has become dysfunctional and has severe problems with concentration, thought processes, memory, learning, reading, sleeping, watching television, and interacting with others. Plaintiff suffers from canker sores and has trouble caring for himself because he forgets to brush his teeth, wash his clothes, go to the bathroom, and write to his family and friends. Plaintiff has also become extremely hyperactive, forgetful, depressed, and anxious. Plaintiff needed other prisoners to assist him with organizing and preparing the present complaint.

Plaintiff claims that Dr. Fishback was deliberately indifferent to Plaintiff's serious medical needs, in violation of the Eighth Amendment, when he discontinued Plaintiff's successful treatment with Ritalin.

## IV. UNDISPUTED FACTS[2]

1. Defendant graduated from Case Western Reserve School of Medicine in 1985.
2. The State of California issued Defendant his license to practice medicine in 1987.
3. Defendant completed his residency in psychiatry in 1990 and is board eligible for the American Board of Psychiatry and Neurology.
4. After completing his residency, Defendant worked in various clinical and administrative settings while establishing his private practice.

///

---

[2] These facts are undisputed for the sole purpose of this motion.

5. In November 1992, Defendant operated his own full time private practice, which included the treatment of adults with attention deficit disorders.

6. Defendant began working as a staff psychiatrist for the CDCR at Pelican Bay State Prison on or about November 18, 2001.

7. Shortly thereafter, the CDCR promoted Defendant to Senior Supervising Psychiatrist and Clinical Director of the Mental Health Crisis Bed Unit.

8. On October 31, 2003, the CDCR promoted Defendant to the position of Chief Psychiatrist for the Division of Correctional Health Care Service at the CDCR and Chief Psychiatrist for Folsom State Prison.

9. As the Chief Psychiatrist for the Division of Correctional Health Care Services, Defendant was responsible for the development of policies and standards for the mental health program to ensure compliance with existing policies and regulations. The position also entailed providing technical advice to advisory committees and mental health professionals engaged in the delivery of mental health services, consulting with professional organizations, public officials, staff and community groups on all phases of the Department's Mental Health Program, establishing and maintaining liaison and cooperative relationships with the mental health professional and allied groups, provider organizations, and other public and private agencies; representing the Department on issues regarding the Mentally Disordered Offender Act; supervising the transfer of inmates to the Department of Mental Health pursuant to appropriate Penal Code sections; conducting studies and preparing reports; and addressing professional and lay groups, the legislature and other committees.

10. On September 1, 2004, Defendant also assumed the duties of the Chief of Mental Health Program for the CDCR.

11. On August 2, 2006, Defendant accepted the position of Chief Psychiatrist at the California Institution for Women in Corona, California, where Defendant remains employed.

| | | |
|---|---|---|
| 1 | 12. | Defendant has never personally met Plaintiff. |
| 2 | 13. | Defendant has never physically examined Plaintiff for any medical or |
| 3 | | psychological condition. |
| 4 | 14. | Defendant has never reviewed Plaintiff's medical/psychological records for the |
| 5 | | purpose of diagnosis or treatment of Plaintiff's alleged ADD and/or ADHD. |
| 6 | 15. | Defendant never rendered medical care to Plaintiff. |
| 7 | 16. | Defendant did not directly supervise either Drs. Jesus Juarez or Simon Villa while |
| 8 | | they worked at CSP. |
| 9 | 17. | Defendant neither provided nor was he responsible for the on-the-job training of |
| 10 | | Drs. Villa and Juarez. |
| 11 | 18. | Ritalin is a mild central nervous system stimulant used in the treatment of ADHD. |
| 12 | 19. | Strattera, another drug for the treatment of ADHD, is not a stimulant. |
| 13 | 20. | Plaintiff ceased taking Ritalin for his alleged ADHD in 2005. |
| 14 | 21. | Despite CSP medical staff ceasing his access to Ritalin for approximately the last |
| 15 | | three (3) years, Plaintiff is able to participate in day-to-day activities such as, but |
| 16 | | not limited to, watching television, washing clothes, eating, brushing teeth, |
| 17 | | communicating with others, artistic endeavors, reading professional medical |
| 18 | | journals, following favorite sport teams, litigating the instant case and |
| 19 | | concentrating for long periods of time.[3] |
| 20 | 22. | On October 4, and November 7, 2005, Defendant responded to Plaintiff's |
| 21 | | complaint regarding the cessation of Ritalin, advising Plaintiff that he may pursue |
| 22 | | an appeal of any denial of medication. |
| 23 | 23. | Ritalin was prescribed by the psychiatric department. |
| 24 | 24. | Plaintiff is currently taking Methodone for back pain. |
| 25 | 25. | Other inmates taking Ritalin also had their medication changed. |
| 26 | /// | |

---

[3] Plaintiff does not dispute that he is able to participate in day-to-day activities, but he does dispute the assertion that he does not suffer from symptoms of ADHD since he lost access to Ritalin.

## V. ANALYSIS

### A. Section 1983 Actions

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of [state law]    . . . subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution. . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

The statute plainly requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). The Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

### B. Eighth Amendment Medical Claim

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)). The two part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)). Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. (citing McGuckin at 1060 (internal quotations omitted)). In applying this standard, the Ninth

1  Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the
2  indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or
3  'medical malpractice' will not support this cause of action."  Broughton v. Cutter Laboratories,
4  622 F.2d 458, 460 (9th Cir. 1980), citing Estelle, 429 U.S. at 105-06.  "[A] complaint that a
5  physician has been negligent in diagnosing or treating a medical condition does not state a valid
6  claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not
7  become a constitutional violation merely because the victim is a prisoner."  Estelle, 429 U.S. at
8  106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995); McGuckin, 974
9  F.2d at 1050, WMX Techs., 104 F.3d at 1136.  Even gross negligence is insufficient to establish
10 deliberate indifference to serious medical needs.  See Wood v. Housewright, 900 F.2d 1332, 1334
11 (9th Cir. 1990).  A prisoner's mere disagreement with diagnosis or treatment does not support a
12 claim of deliberate indifference.  Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

### 1. **Defendant's Position**

Defendant argues that there is no evidence that he knew about Plaintiff's medical condition, knew of the likelihood of causing him harm, or acted with intent to harm.

Defendant contends that he had no physician-patient relationship with Plaintiff or advised other health care providers as to Plaintiff's treatment for ADHD.  Defendant never examined, diagnosed or treated Plaintiff for his alleged medical condition.  (Undisputed Facts ("UF") 12-15.)  Defendant acknowledges that Plaintiff informed him on September 19, 2005, of CSP's denial of Ritalin as a treatment for ADHD, See Exh. A. to Declaration of Dr. Fishback ("Fishback Decl."), Doc. 129-1; however, Defendant asserts that the interaction between Defendant and Plaintiff was not enough to appraise Defendant of Plaintiff's particularized medical condition or create a physician-patient relationship.  Also, Defendant did not directly supervise Plaintiff's doctors, Dr. Jesus Juarez or Simon Villa, while they worked at CSP, nor was he responsible for on-the-job training for Drs. Juarez or Villa.  (UF ¶¶16, 17.)  Defendant also denies that he ever threatened any CSP medical staff with insubordination if a staff member prescribed Ritalin to an inmate for ADD or ADHD.  (Fishback Decl., Doc. 129 at ¶28.)

///

Defendant argues that he did not promulgate any policy precluding the prescription of Ritalin to inmates at CSP, and even assuming he did promulgate a policy, he did not act with the requisite intent to harm. (Id. at 3 ¶19, 4 ¶27.) Defendant asserts that theoretically Plaintiff may still receive Ritalin for his alleged medical condition. (Id. at 4 ¶27.) Moreover, Defendant maintains that Plaintiff has admitted that Defendant did not intend to harm him by the alleged unwritten policy or that said policy was directed to Plaintiff. (Declaration of Ovidio Oviedo, Jr., ("Oviedo Decl."), Doc. 127, Exh A, Deposition of Steven Vlasich ("Vlasich Depo."), at 175:13-22, 175:25-176:12, 193:12-20.)

Defendant also argues that there is no evidence that his alleged acts or omissions created a substantial risk or caused Plaintiff significant further harm. Plaintiff stopped receiving Ritalin in 2005 and now complains that he has become dysfunctional and has severe problems with concentration, thought processes, memory, learning, reading, sleeping, watching television, and interacting with others. (Cmp. at 11 ¶31.) Defendant asserts that Plaintiff is still able to participate in major life functions, despite stopping Ritalin. (UF 21.) Defendant presents evidence that Plaintiff has admitted he is able to care for himself, participate in personal relationships, focus on singular activities, sit for long periods of time, read and understand professional medical journals, write, draw, watch television and effectively prosecute the instant case. (Vlasich Depo. at 181:23-184:2, 184:11-185:20.) Defendant contends that Plaintiff was not harmed because even assuming Defendant was responsible for the discontinuation of Ritalin in Plaintiff's case, Plaintiff still functions normally without Ritalin.

Finally, Defendant asserts that CSP medical staff offered Plaintiff alternative treatments (e.g., Strattera), and that Defendant had no official information that the alternative drugs offered to Plaintiff were ineffective and/or health threatening to Plaintiff. Thus, Defendant maintains that he could not have formed the culpable state of mind necessary for liability under the Eighth Amendment.

The Court finds that Defendant has met his initial burden of informing the Court of the basis for his motion, and identifying those portions of the record which he believes demonstrate the absence of a genuine issue of material fact. The burden therefore shifts to Plaintiff to establish

9

that a genuine issue as to any material fact actually does exist. See Matsushita, 475 U.S. at 586. As stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong, 474 F.2d at 749.

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim," Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal citation omitted), and a difference of opinion between medical personnel regarding treatment does not amount to deliberate indifference. Sanchez, 891 F.2d at 242. To prevail, a plaintiff must set forth admissible evidence showing "that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to [his] health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986) (internal citations omitted).

### 2. **Plaintiff's Position**

Turning to Plaintiff's position, the Court looks to Plaintiff's opposition and verified complaint.[4] [5] (Docs. 1, 146.)

---

[4] Defendant argues that the Court should reject Plaintiff's opposition as procedurally defective, because Plaintiff failed to comply with Local Rule 260(b) which requires the opposing party to "reproduce the itemized facts in the Statement of Undisputed Facts," "admit those facts that are undisputed," "deny those [facts] that are disputed," "includ[e] with each denial a citation," and "fil[e] with the Clerk [] all evidentiary documents cited in the opposing papers." L.R. 260(b). The Court recognizes that Plaintiff failed to comply with every instruction of the federal and local rules. However, both Plaintiff and Defendant shall be heard by the Court on this dispositive matter. "There is

Plaintiff claims that Defendant issued a directive prohibiting doctors at CSP from prescribing the medication Ritalin for ADHD, which caused Plaintiff's doctors to stop his Ritalin treatment for ADHD, resulting in Plaintiff suffering serious symptoms.

Plaintiff states that he was diagnosed with ADD as a child and was prescribed Ritalin for ADHD symptoms. (Cmp., Doc. 1 at 3 ¶9.)[6] Plaintiff states that he has been in the CCCMS [mental health] program at CSP since 1996. (Id. at 3 ¶11.) Plaintiff also states that on July 13, 2001, he was diagnosed with adult ADHD and was prescribed Ritalin. (Id. at 3 ¶12.) Plaintiff states that eight different psychologists diagnosed him with ADHD and prescribed Ritalin, and an additional four psychologists also diagnosed him with ADHD. (Id. at 4 ¶¶13, 14.)

In June and July 2005, Plaintiff's doctors told him that "Sacramento," via Dr. Fishback, CDCR Chief Psychologist, had issued a memo proscribing the use of Ritalin for treatment of inmates with ADHD. (Cmp., Doc. 1 at 5-7 ¶¶15-22.) Plaintiff's Ritalin prescription was decreased and then stopped completely about July 18, 2005, and he was prescribed the medication Strattera instead. (Id. at 4-5 ¶15, 7 ¶21.) The prescription for Strattera was discontinued on August 12, 2005 because Plaintiff had serious side effects. (Id. at 8 ¶24.) On September 3, 2005, Dr. Juarez told Plaintiff that Dr. Fishback threatened Dr. Juarez verbally with insubordination if he kept prescribing Ritalin to prisoners, and that if not for Fishback, Plaintiff's Ritalin therapy would not have been interrupted. (Id. at 9-10 ¶27.) Plaintiff provides evidence that Dr. Villa told

---

a 'well established' principle that '[d]istrict courts have inherent power to control their dockets.'" United States v. W. R. Grace, 526 F.3d 499, 509 (9th Cir. 2008) (quoting Atchison, Topeka & Santa Fe Ry. Co. v. Hercules Inc., 146 F.3d 1071, 1074 (9th Cir. 1998) (alteration in original) (internal quotation marks omitted).

[5] A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. McElyea, 833 F.2d at 197-98; Lew, 754 F.2d at 1423; Fed. R. Civ. P. 56(e). Therefore, the Court considers Plaintiff's verified complaint to be an affidavit in opposition of the motion for summary judgment. Plaintiff's opposition is not verified, and Plaintiff's declaration in support of the opposition is not dated or signed and therefore is not admissible evidence. Plaintiff also refers to Exhibits A-X which are not attached to Plaintiff's opposition or found elsewhere on the Court's record and therefore are not considered. The Court notes that Plaintiff has combined his opposition to the instant motion and his opposition to another pending motion for summary judgment in this action (filed April 30, 2010 by defendants Juarez and Villa) into one handwritten eighty-seven-page document, making it difficult for the Court to decipher which facts and arguments are applicable to each of the two individual motions.

[6] When the pagination of a party's document differs from the pagination used by the Court's electronic filing system, the Court uses the pagination of the Court's electronic filing system.

another inmate, Patrick Brady, that "Sacramento" had discontinued Ritalin, and that Dr. Juarez told Brady that Dr. Fishback threatened him with insubordination if he did not discontinue all stimulant prescriptions. (Declaration of Patrick Brady ("Brady Decl.") in support of Opposition, Doc. 146 at 15-18.)

Dr. Fishback wrote Plaintiff two letters dated October 4, 2005 and November 7, 2005, erroneously stating that Plaintiff had been advised that Ritalin is a non-formulary medication and is no longer prescribed unless approved by the Health Care Manager on an individual basis, and that other comparable medications were available and could be prescribed by Plaintiff's physician. (Cmp. at 10-11 ¶30.)

As a result of the discontinuation of Ritalin, Plaintiff claims he has become dysfunctional and has severe problems with concentration, thought processes, memory, learning, reading, sleeping, watching television, and interacting with others. (Id. at 11 ¶31.) Plaintiff has trouble caring for himself because he forgets to brush his teeth, wash his clothes, go to the bathroom, and write to his family and friends. (Id.) Plaintiff believes the stress of stopping Ritalin caused him to develop painful canker sores in his mouth. (Id. at 11 ¶32.) Plaintiff has also become extremely hyperactive, forgetful, depressed, and anxious. (Id.) Plaintiff provides evidence that James Mickey, another inmate, who lived with Plaintiff from about 2003 to 2010, observed that Plaintiff "became another person" after ceasing to take Ritalin, becoming argumentative, forgetful, and hyperactive. (Declaration of James Mickey ("Mickey Decl.") in support of Opposition, Doc. 146 at 21.) Mickey stated that if he asked Plaintiff what happened or what someone said, Plaintiff almost always said, "I don't know because I was thinking of something else." (Id.) Also, Plaintiff needed other prisoners to assist him with organizing and preparing the present complaint. (Cmp. at 12 ¶35.)

### 3. Discussion

With regard to Defendant's knowledge about Plaintiff's medical need, Plaintiff provides evidence that Defendant knew of his concern about Ritalin, but not that Defendant knew Plaintiff had a serious medical need. Defendant acknowledges that he received a letter from Plaintiff dated September 19, 2005 informing him of Plaintiff's concerns about his inability to obtain Ritalin to

treat his ADHD. ( See Exh. A. to Fishback Decl., Doc. 129-1.) Although Defendant wrote back to Plaintiff on October 4 and November 7, 2005, there is no evidence that he knew, at that time, that Plaintiff had a serious medical need, such that "failure to provide treatment could result in further significant injury or the unnecessary and want infliction of pain." Defendant's response to Plaintiff indicates that Defendant believed Plaintiff knew about other comparable medications available, and that Plaintiff had been given a prescription for Wellbutrin, a therapeutic medication for ADHD, on August 1, 2005. Id. It is undisputed that Defendant never personally met Plaintiff, physically examined Plaintiff for any medical or psychological condition, reviewed Plaintiff's medical/psychological records for the purpose of diagnosis or treatment of Plaintiff's alleged ADD and/or ADHD, or rendered medical care to Plaintiff. (UF 12-15.) There is no evidence that Defendant gained any knowledge elsewhere about Plaintiff's condition. Thus, there is no evidence that Defendant knew Plaintiff had a serious medical need.[7]

Even if Defendant knew that Plaintiff had a serious medical need, there is no evidence that Defendant purposely acted or failed to respond to Plaintiff's pain or possible medical need, causing harm. There is no evidence Defendant knew anything about Plaintiff's particular medical needs until Defendant received Plaintiff's September 19, 2005 correspondence. In his response to Plaintiff's correspondence, Defendant indicates that he gathered information about Plaintiff's condition from medical staff at CSP, discovering that Plaintiff had filed several appeals addressing the Ritalin issue, and that Plaintiff had been interviewed on July 4, 2005 regarding his medical prescriptions. (Exh. A to Fishback Decl., Doc. 129-1.) Defendant also indicates in the response that he understood Plaintiff had been informed that other medications were available and had been given a prescription for a new medication. Id. Defendant advised Plaintiff that he should continue to use the inmate appeal process if he was dissatisfied with the medical care he was receiving. Id. Defendant also encouraged Plaintiff to use the "sick call" process to request an

---

[7] Defendant questions whether Plaintiff actually suffers from ADHD, since there is no admissible evidence that Plaintiff was diagnosed with the condition. However, Plaintiff's assertion that he was diagnosed with ADD and ADHD and has been treated with Ritalin since childhood reflects Plaintiff's personal knowledge, and evidence of diagnostic tests are not required to determine whether Plaintiff had a serious medical need or whether Defendant had knowledge.

appointment with a clinician to address his concerns. Id. There is no evidence of further correspondence between Plaintiff and Defendant showing that Defendant gained any additional knowledge about Plaintiff's condition or acted with deliberate indifference.

There is also no evidence that Defendant's official reference to doctors regarding the use of Ritalin at CSP was directed at Plaintiff or Plaintiff's treatment regime. All evidence of Defendant's actions show that he acted with general concern about the advisability of prescribing Ritalin to all inmates. Defendant asserts that he only "suggested" to doctors at CSP that no new prescriptions for Ritalin be written for new patients until a structured program for the diagnosis and treatment of patients with ADD and ADHD was established. (Fishback Decl. ¶20.) Defendant maintains that he based this suggestion on the fact that Strattera, a new drug for the treatment of ADD and ADHD, posed a smaller threat for addiction than Ritalin. (Id. at ¶21.) Defendant contends that because many inmates have histories of drug addictions, traditional stimulants, such as Ritalin, are commonly contraindicated (i.e., not prescribed) for use with drug addicts. (Id. at ¶25.) Plaintiff provides no evidence that Defendant's directive was directed at him. Therefore, there is no evidence that Defendant intended to act against Plaintiff or disregard Plaintiff's medical need when he issued his directive about Ritalin.

There is no admissible evidence that Plaintiff was harmed by his inability to take Ritalin. Defendant contends there was no harm, because Plaintiff is able to participate in day-to-day activities, despite stopping Ritalin. (Vlasich Depo. at 181:23-184:2, 184:11-185:20.) However, such evidence does not prove that Plaintiff is not suffering from symptoms that affect his *full* participation in activities. Plaintiff asserts that he has trouble with memory and concentration since stopping Ritalin. (Cmp. at 11 ¶¶31, 32.) However, Plaintiff's assertion as a layperson that such symptoms resulted from the discontinuation of Ritalin is not admissible evidence. Also, the fact that Plaintiff has other medical conditions and takes other medications makes it more

///
///
///
///

probable that Plaintiff's symptoms have other causes besides the absence of Ritalin in Plaintiff's system.[8]  Therefore, the Court finds no admissible evidence that Plaintiff was harmed by the discontinuation of Ritalin.

Even if Plaintiff could prove that he was harmed because Defendant's directive prevents him from taking Ritalin, Plaintiff has not shown more than a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment.  Plaintiff has not provided any evidence that Defendant chose to stop his access to Ritalin in contradiction to established medical practice.  Defendant has provided evidence that he only meant to improve the treatment options for inmates with ADHD.  As a layman, Plaintiff is not qualified to offer an opinion about whether Ritalin is a better treatment for him, and a prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference.  Sanchez, 891 F.2d at 242.

Based on the foregoing, the Court finds that Plaintiff has not provided admissible evidence that he had a serious medical need and that Defendant acted, or failed to act, with deliberate indifference to his serious medical need.  Thus, The Court finds that Plaintiff has not established the existence of triable issues of material fact as to his Eighth Amendment medical care claim against Defendant, and Defendant is entitled to judgment as a matter of law.

**C.     Qualified Immunity**

Defendant argues that he is entitled to qualified immunity.  Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982).  "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 129 S.Ct. 808, 815 (2009), and protects "all but the

///

---

[8] Plaintiff also has Hepatitis C.  (Vlasich Depo. at 173:12-15.)  Plaintiff also has a history of drug use.  Id. at 189:1-23.)  Plaintiff is currently taking Methadone for back pain.  (UF 24.)  Plaintiff has also taken Effexor and Prozac for anxiety and depression.  (Cmp. at 10 ¶¶27, 29.)

1  plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335,
2  341, 106 S.Ct. 1092, 1096 (1986).
3        In resolving a claim of qualified immunity, courts must determine whether, taken in the
4  light most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if
5  so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151,
6  2156 (2001); McSherry v. City of Long Beach, 560 F.3d 1125, 1129-30 (9th Cir. 2009). While
7  often beneficial to address in that order, courts have discretion to address the two-step inquiry in
8  the order they deem most suitable under the circumstances. Pearson, 129 S.Ct. at 818 (overruling
9  holding in Saucier that the two-step inquiry must be conducted in that order, and the second step
10 is reached only if the court first finds a constitutional violation); McSherry, 560 F.3d at 1130.
11       As discussed above, the Court finds that Defendant Fishback did not violate Plaintiff's
12 constitutional rights. Therefore, the issue of qualified immunity shall not be considered.
13 **VI. CONCLUSION AND RECOMMENDATION**
14       The Court concludes that Defendant Dr. Timothy Fishback is entitled to judgment as a
15 matter of law because Plaintiff has not established the existence of triable issues of material fact
16 as to his Eighth Amendment medical care claim against Defendant. Accordingly, the Court
17 RECOMMENDS that Defendant Fishback's motion for summary adjudication of the claims
18 against him be GRANTED.
19       The Court further ORDERS that these Findings and Recommendations be submitted to the
20 United States District Court Judge assigned to this action pursuant to the provisions of 28 U.S.C.
21 § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District
22 Court, Eastern District of California. Within TWENTY (20) days after being served with a copy
23 of these Findings and Recommendations, any party may file written objections with the Court and
24 serve a copy on all parties. Such a document should be captioned "Objections to Magistrate
25 Judge's Findings and Recommendations." The Court will then review the Magistrate Judge's
26 ///
27 ///
28 ///

ruling pursuant to 28 U.S.C. § 636 (b)(1)(c).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the order of the district court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **August 31, 2010**              /s/ **Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE