1
2
3
4
5
6 **UNITED STATES DISTRICT COURT**
7 EASTERN DISTRICT OF CALIFORNIA
8

9 STEVEN VLASICH,                          1:05-cv-01615-LJO-GSA-PC

10                    Plaintiff,           FINDINGS AND RECOMMENDATIONS,
                                           RECOMMENDING THAT DEFENDANTS
11        v.                               JUAREZ'S AND VILLA'S MOTION FOR
   DR. TIMOTHY FISHBACK, et al.,           SUMMARY JUDGMENT BE GRANTED
12                                         (Doc. 141.)

13                    Defendants.          OBJECTIONS, IF ANY, DUE IN 30 DAYS

14 _____/

15 **I.    RELEVANT PROCEDURAL HISTORY**

16        Steven Vlasich ("Plaintiff") is a state prisoner in custody of the California Department of

17 Corrections and Rehabilitation ("CDCR"), proceeding pro se and in forma pauperis with this civil

18 rights action pursuant to 42 U.S.C. § 1983.  This action now proceeds on the original Complaint filed

19 by Plaintiff on December 20, 2005, against defendants Dr. Jesus Juarez and Dr. Simon Villa

20 ("Defendants"), on Plaintiff's medical claims under the Eighth Amendment.[1]  (Doc. 1.)

21        On April 30, 2010, Defendants filed a motion for summary judgment.  (Doc. 141.)  On June

22 15, 2010, Plaintiff filed an opposition.[2]  (Doc. 146.)  On August 4, 2010, Defendants filed a reply.

23 (Doc. 152.)  Defendants' motion is now before the Court.

24 _____

25        [1]On November 5, 2007, the Court dismissed Plaintiff's due process, ADA, RA, and state law claims, and
   the Eighth Amendment claims against CDCR, based on Plaintiff's failure to state a claim.  (Doc. 28.)  The Court also
26 dismissed defendant CDCR from this action, based on Plaintiff's failure to state any claim against CDCR.  Id.  On
   October 29, 2010, the Court dismissed defendant Dr. Fishback from this action via summary judgment.  (Doc. 165.)
27 As a result, defendants Juarez and Villa are the only defendants remaining in this action.

28        [2]Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the
   Court in an order filed on September 14, 2007.  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (Doc. 26.)

1

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.11 (1986); First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289 (1968);  Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute

1   is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

2   party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

3        A verified complaint in a pro se civil rights action may constitute an opposing affidavit for

4   purposes of the summary judgment rule, where the complaint is based on an inmate's personal

5   knowledge of admissible evidence, and not merely on the inmate's belief. McElyea v. Babbitt, 833

6   F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hosp., 754 F.2d 1420, 1423 (9th Cir.

7   1985); Fed. R. Civ. P. 56(e). Plaintiff's Complaint is verified and will be considered by the Court in

8   resolving Defendants' motion to the extent that it sets forth admissible facts. The parties bear the

9   burden of supporting their motions and oppositions with the papers they wish the court to consider

10  and/or by specifically referring to any other portions of the record they wish the court to consider.

11  Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will

12  not undertake to mine the record for triable issues of fact. Id.

13
    **III.   PLAINTIFF'S ALLEGATIONS AND CLAIMS AGAINST DR. JUAREZ AND DR.**
14  **VILLA**

15       Plaintiff is an inmate housed at California State Prison-Corcoran ("CSP"), where the

16  events at issue in this action allegedly occurred. Defendant Dr. Jesus Juarez was the acting Chief

17  Psychiatrist for CSP, and defendant Dr. Simon Villa was a psychiatrist at CSP. Plaintiff alleges as

18  follows in the Complaint.

19       Plaintiff was diagnosed with Attention Deficit Disorder ("ADD") as a child and was

20  prescribed the medication Ritalin. On July 13, 2001, Plaintiff was diagnosed with adult Attention

21  Deficit Hyperactivity Disorder ("ADHD") and was prescribed Ritalin. Between 2001 and 2005,

22  ten different psychologists or psychiatrists, along with Dr. Juarez and Dr. Villa, diagnosed

23  Plaintiff with ADHD, and seven of them prescribed Ritalin as treatment for Plaintiff. On June 9,

24  2005, Dr. Villa told Plaintiff he had to discontinue Plaintiff's Ritalin treatment because

25  "Sacramento" issued a memo proscribing the use of Ritalin for treatment of ADHD in inmates.

26  Dr. Villa told Plaintiff there was no other medication available for him. Dr. Villa prescribed

27  Ritalin in a continually-decreasing dose until the medication was stopped in July 2005.

28  ///

On June 10, 2005, Plaintiff filed an Americans with Disabilities Act ("ADA") request on form 1824. On July 4, 2005, Dr. Knight interviewed Plaintiff about the ADA request, recommended Plaintiff continue taking Ritalin, and prescribed Plaintiff his regular dosage. Dr. Knight told Plaintiff it was not true that "Sacramento" had issued a memo proscribing treatment with Ritalin for ADHD.

On July 14, 2005, Dr. Villa stopped the Ritalin prescription Dr. Knight had written for Plaintiff. On July 15, 2005, Plaintiff complained to psychologist Puljol about Dr. Villa discontinuing the prescription, and Puljol told Plaintiff that Dr. Juarez told her that "Sacramento" had sent a memo proscribing the use of Ritalin.

On July 29, 2005, Plaintiff complained to Puljol about not receiving the ADA form back and not having any medication for his ADHD symptoms. Plaintiff gave Puljol a letter he had just received from the "Coleman Attorneys" stating that they had met with the CDC and that T. Fishback, Chief Psychiatrist of CDCR, told them that he and "Sacramento" had not issued a directive to discontinue Ritalin. Puljol asked Plaintiff if she could make copies of the letter to give to Dr. Juarez and Dr. Villa. Plaintiff agreed, and she came back with a copy of a fax from Dr. Fishback to Dr. Juarez, which she gave to Plaintiff. She returned Plaintiff's letter and told Plaintiff that Dr. Juarez offered to prescribe him the medication Strattera for his ADHD. Plaintiff signed a form to get Strattera.

The original message in the fax was sent on May 19, 2005 from Dr. Juarez to Dr. Fishback and read, "I informed John Klarich MD of your request to have Ritalin (Methylphenidate) discontinued from being prescribed to inmates here at Corcoran State Prison. He would like this in writing so could you send us a memo on this subject?" On May 21, 2005, Dr. Fishback answered, "Yes. When I get a statewide memo prepared, I will send it."

Plaintiff finally received a first level response to his ADA request, dated July 18, 2005. On the response, Dr. Juarez had taken a black marker and obliterated Dr. Knight's favorable recommendation and replaced it with his own. Dr. Juarez denied the ADA request, stating in part that new guidelines issued by Dr. Fishback state that Plaintiff's medication cannot be prescribed in Corrections.

Plaintiff had serious side effects from Strattera and the prescription was discontinued on August 12, 2005. On August 18, 2005, Dr. Villa interviewed Plaintiff, and Plaintiff explained that he needed to resume taking Ritalin. Dr. Villa told Plaintiff that "Sacramento" was not allowing him to prescribe Ritalin, but when Plaintiff showed him the Coleman letter, he said that he could prescribe it, but that the Chief Medical Officer would not approve it. Plaintiff asked him to write the prescription but he refused. Plaintiff asked him what other medications were available for ADHD, and he said there were none. Plaintiff tried to discuss his anxiety problem with Dr. Villa and requested medication for that disorder. Dr. Villa yelled and walked away. Plaintiff filed an appeal against Dr. Villa for his unprofessional behavior. The appeal was rejected as a duplicate issue.

On September 3, 2005, Dr. Juarez interviewed Plaintiff and told him there were no new guidelines or memo, and Ritalin was always non-formulary. Dr. Juarez said that Dr. Fishback keeps threatening him verbally with insubordination if he allows any doctor at Corcoran to prescribe Ritalin. Dr. Juarez said that he would continue Plaintiff's treatment with Ritalin, if not for Dr. Fishback's threats. Dr. Juarez prescribed the medication Effexor to treat Plaintiff's depression and anxiety. He also told Plaintiff that three prisoners at Corcoran were still taking Ritalin.

On October 3, 2005, Dr. Juarez denied Plaintiff's ADA request at the second level of review, stating, "The issue of Ritalin (Methylphenidate) will be revisited after a statewide memo is prepared by Dr. Timothy Fishback."

Plaintiff is currently taking Prozac for depression and anxiety, which Plaintiff contends is caused by the lies, deceit and total lack of any treatment for his ADHD.

As a result of the discontinuation of Ritalin, Plaintiff has become dysfunctional and has severe problems with concentration, thought processes, memory, learning, reading, sleeping, watching television, and interacting with others. Plaintiff suffers from canker sores and has trouble caring for himself because he forgets to brush his teeth, wash his clothes, go to the bathroom, and write to his family and friends. Plaintiff has also become extremely hyperactive,

///

forgetful, depressed, and anxious.  Plaintiff needed other prisoners to assist him with organizing and preparing the present Complaint.

Plaintiff claims that Dr. Villa and Dr. Juarez were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, based on their actions in discontinuing Plaintiff's successful treatment with Ritalin.

## IV.   UNDISPUTED FACTS[3]

1.   Steven Vlasich is a California State inmate who, at all relevant times, was incarcerated at CSP.

2.   Doctors Juarez and Villa were psychiatrists employed at the prison where Vlasich was incarcerated.

3.   ADHD affects everyone differently.

4.   There is no objective test used to confirm whether a patient actually has ADHD, and in the prison setting, correctional doctors must rely on reports from correctional staff to confirm the existence of functional impairments, and inmate-patients' self-reported symptoms, to diagnose and treat the disorder.

5.   In the treatment of symptoms of ADHD, it is not possible to reliably predict whether a particular medication will be effective for a given patient since the response to medications is individualized.

6.   Ritalin is a central nervous system stimulant classified as a Schedule II narcotic under the Controlled Substances Act.

7.   Schedule II is the classification for medical drugs with the highest abuse potential and addiction profile.

---

[3]These facts are undisputed for the sole purpose of this motion.  The Court has compiled the summary of undisputed facts from Defendants' statement of undisputed facts, Plaintiff's statement of disputed facts, and Plaintiff's verified Complaint.  A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.  McElyea, 833 F.2d at 197-98; Lew, 754 F.2d at 1423; Fed. R. Civ. P. 56(e).  Although Plaintiff submitted his own statement of undisputed facts with citations to exhibits, Plaintiff failed to submit the exhibits.  The Court accepts the undisputed facts where Plaintiff's verified Complaint is not contradictory.

8. Taking excessive doses of Ritalin over time can produce addiction.

9. There is an increased risk of abuse involved when prescribing Ritalin, or any other stimulant medication, to individuals with a history of drug abuse.[4]

10. While Ritalin is approved by the Food and Drug Administration (FDA) for the treatment ADHD in children and adolescents, it is not FDA-approved for the treatment of adult ADHD.

11. Ritalin is, however, prescribed "off label" to treat adult ADHD.

12. "Off-label" is the practice of prescribing pharmaceuticals for the treatment of a medical condition other than the condition(s) that the medication was FDA-approved to treat.

13. Strattera is FDA-approved to treat ADHD and can be used to treat symptoms of hyperactivity and distractibility.

14. Effexor, Prozac, and Wellbutrin are used in their "off label" capacity to treat ADHD and also can be used to treat symptoms of hyperactivity and distractibility.

15. Strattera, Effexor, Prozac, and Wellbutrin are not stimulants and therefore pose less threat of addiction.

16. From 1985, until his incarceration in 1989, Vlasich used: (1) methamphetamines three to four times weekly, when they were available, for a period of three or four months; (2) LSD four to five times a week until it "pretty much fried [his] brain," and caused him to stutter and lose things; (3) cocaine once a month for approximately 15 months; (4) marijuana approximately one hundred times; and (5) hash approximately five times.

17. Vlasich received Wellbutrin in 2000, and it helped with his symptoms.

18. In 2001, Juarez evaluated Vlasich for his complaints of hyperactivity and distractibility.

---

[4]Plaintiff maintains this fact is not relevant, because he has not used an illicit drug in over 20 years and has no plans to use any.  However, Plaintiff does not dispute that individuals with a history of drug abuse have an increased risk of abuse when stimulants are prescribed to them.  Therefore, this fact remains undisputed for purposes of this motion.

19.  Juarez believed that, based on Vlasich's report of symptoms, they could have been attributed to ADHD, other psychiatric disorders, or his prior drug use.

20.  Juarez first prescribed Ritalin to Vlasich on a trial basis in July 2001, in response to his self-reported symptoms of hyperactivity and distractibility, and his self-reported history of ADHD and successful treatment with Ritalin. and continued Vlasich's trial treatment with Ritalin until approximately April 2002.

21.  Juarez did not at any time affirmatively diagnose Vlasich with ADHD.[5]

22.  Although Juarez requested Vlasich's childhood psychiatric records, he never received a response to his request, and thus, was unable to verify that such records existed.

23.  Although Juarez was aware that Vlasich had a history of drug use, at the time he prescribed Ritalin, he did not know the full extent of the drug use.[6]

24.  Juarez never was able to confirm that the symptoms reported by Vlasich were caused by ADHD, another psychiatric disorder, or resulted from his prior drug use.

25.  Villa renewed Vlasich's Ritalin prescription for a brief period in 2002.

26.  Villa did not, at any time, affirmatively diagnose Vlasich with ADHD.[7]

27.  Juarez and Villa sat as members of the Controlled Substances Committee that reviewed Vlasich's treatment with Ritalin.[8]

///

///

---

[5]In the Complaint, Plaintiff declares that defendant Juarez diagnosed him with ADHD.  However, Plaintiff has not submitted evidence to support his statement.  Therefore, this fact remains undisputed for purposes of this motion.

[6]Plaintiff disputes this fact, stating that he explained everything about his drug use to Juarez and Juarez told him that his brief ancient history of limited drug use did not matter.  However, Plaintiff's statement was not verified and is not admissible evidence.  Therefore, this fact remains undisputed for purposes of this motion.

[7]In the Complaint, Plaintiff declares that defendant Villa diagnosed him with ADHD.  However, Plaintiff has not submitted evidence to support his statement.  Therefore, this fact remains undisputed for purposes of this motion.

[8]Plaintiff disputes that such a committee exists, but he has not submitted any admissible evidence in support of this belief.  Therefore, this fact remains undisputed for purposes of this motion.

28. The Committee's decision, in approximately June 2005, was based on a review of Vlasich's unit health record (medical file) and central file (which contains documents concerning his incarceration, programming, and discipline).

29. Juarez was no longer Vlasich's treating psychiatrist at the time he and Villa sat as members of the Controlled Substances Committee.

30. The decision to discontinue Vlasich's treatment with Ritalin was unanimous.

31. Defendants recommended against the continued prescription of Ritalin to Vlasich because of the potential for abuse and the lack of findings to justify its continued use in his case. Defendants' decisions were based in part on the following factors: (1) their inability to confirm that Vlasich was diagnosed with, or treated for, ADHD; (2) their inability to confirm that the symptoms Vlasich claimed actually resulted from ADHD; (3) Villa's inability to confirm that Vlasich had significant problems programming that would justify treatment with Ritalin; and (4) additional information Juarez had received regarding Vlasich's history of drug abuse. At this time, Defendants believed that the risks of continuing to treat Vlasich with Ritalin outweighed the benefits.[9]

32. After the committee's assessment, certain inmates at CSP-Corcoran continued to receive stimulant medications for the treatment of ADHD.

33. Consistent with the committee's determinations, Juarez continued to prescribe Ritalin to the inmates who he believed could safely and effectively be treated with the medication.

///

///

---

[9]In the Complaint, Plaintiff alleges that on June 9, 2005, defendant Villa told him he had to discontinue the treatment with Ritalin because "Sacramento" had issued a memo stating that ADHD could not be treated anymore, and that on September 3, 2005, defendant Juarez told him he would continue Plaintiff's Ritalin prescription if not for Dr. Fishback's threats of insubordination. (Compl. ¶¶15, 27.) Plaintiff maintains that the only reason his Ritalin was discontinued was because of Dr. Fishback's directive to discontinue all prescriptions for stimulants. (Opp'n, Doc. 146 ¶11.) However, Plaintiff has not submitted any admissible evidence that Defendants' decisions to stop his Ritalin prescription were not based in part on the factors noted in fact 31. Therefore, this fact remains undisputed for purposes of this motion.

34. Defendants were not aware of any substantially serious risk of harm to Vlasich's health caused by the discontinuation of his treatment with Ritalin, or the failure to prescribe other stimulant medications.

35. Given all the factors in Vlasich's case, Defendants believed that the risks of such treatment outweighed the benefits.

36. Beginning in June 2005, Villa began tapering down Vlasich's Ritalin prescription.

37. Vlasich filed a request to continue his treatment with Ritalin and, as a result, Dr. Knight reinstated his prescription.

38. Villa stopped Vlasich's Ritalin prescription which had been reinstated by Dr. Knight.

39. Dr. Knight was a contract psychiatrist and did not sit on the Controlled Substances Committee, and Villa believed he was not aware of the information reviewed by the Committee.

40. Aside from the single prescription of Ritalin by Dr. Knight in July 2005, the Ritalin prescription was continually tapered down until its discontinuation in late July 2005.

41. After discontinuing the Ritalin prescription by Dr. Knight, Villa was no longer Vlasich's treating psychiatrist, and Vlasich did not attempt to get any ADHD medications from him.

42. In late July 2005, Juarez was notified that Vlasich was requesting treatment for his symptoms of hyperactivity and distractibility, and although Juarez was not then his treating psychiatrist, Juarez prescribed Strattera to Vlasich in his capacity as the Acting Chief Psychiatrist at CSP-Corcoran.

43. Juarez was not aware of any substantial risk of serious harm to Vlasich's health created by his treatment with Strattera.

44. Vlasich concedes that Juarez did not prescribe Strattera in conscious disregard of his health.

45. On August 18, 2005, Vlasich stopped taking Strattera because of its side effects.

46.  In October 2005, Juarez was notified that Vlasich was requesting treatment for his symptoms of hyperactivity and distractibility, and although Juarez still was not his treating psychiatrist, Juarez prescribed Effexor to Vlasich in his capacity as the Acting Chief Psychiatrist at CSP-Corcoran.

47.  Juarez was not aware of any substantial risk of serious harm to Vlasich's health created by his treatment with Effexor

48.  Vlasich discontinued Effexor on his own.

49.  Vlasich cannot recall telling either Juarez or Villa that he had discontinued his treatment with Effexor.

50.  After Vlasich's treatment with Effexor was discontinued, Juarez was informed that Vlasich had been offered Wellbutrin to treat his symptoms of hyperactivity and distractibility, but he declined the treatment and insisted on receiving a stimulant medication.

51.  Vlasich was prescribed Prozac on October 25, 2005.

52.  ADHD is not life-threatening.

53.  Vlasich admits that he is able to write letters and keeps "fairly busy" doing so, corresponding with his parents, a friend named Jeff, and his nephew.[10]

54.  Vlasich maintained a "good friendship" with his cellmate of three years, and maintained a friendship with a female inmate housed at Chowchilla.

55.  Vlasich can focus on things that really interest him, watches football games and movies, and is able to follow the Raiders.

56.  Vlasich educated himself about Adult ADHD by reading a clinical book designed for professionals.

57.  Vlasich files administrative grievances, without assistance, and follows them through to completion.

---

[10]With regard to facts 53-61, Plaintiff responds that his ability to perform these tasks does not mean that his ADHD is not affecting his life activities by causing him to be forgetful, impulsive, disorganized and hyperactive. However, Plaintiff acknowledged in his deposition that he is able to perform these tasks. Therefore, facts 53-61 remain undisputed for purposes of this motion.

58.     Vlasich files and litigates lawsuits, representing himself, including the instant
        action.

59.     Vlasich brushes his teeth daily.

60.     Vlasich concedes he has the option of using the prison laundry service or washing
        his clothes himself, and for the items he elects to wash himself, he does wash his
        clothes.

61.     During the five continuous hours of deposition in this action, Vlasich was able to
        answer difficult questions, review approximately 400 pages of documents during
        the first hour and a half of his deposition in this case, and locate documents
        responsive to requests to production, even though his purported ADHD was
        untreated at the time.

62.     Dr. Juarez is no longer employed at CSP.

63.     Dr. Villa is no longer employed at CSP.

## V.    ANALYSIS

### A.    Section 1983 Actions

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of [state law] . . . subjects, or causes to be
> subjected, any citizen of the United States . . . to the deprivation of any rights,
> privileges, or immunities secured by the Constitution . . . shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding for redress.
> 42 U.S.C. § 1983.

The statute plainly requires that there be an actual connection or link between the actions

of the defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v.

Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  The

Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional

right, within the meaning of section 1983, if he does an affirmative act, participates in another's

affirmative acts or omits to perform an act which he is legally required to do that causes the

deprivation of which complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

///

///

12

**B.**   **Eighth Amendment Medical Claim**

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)).  The two part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)).  Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060).  Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. (citing McGuckin at 1060 (internal quotations omitted)).

In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle, 429 U.S. at 105-06.  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995); McGuckin, 974 F.2d at 1050, WMX Techs., 104 F.3d at 1136.  Even gross negligence is insufficient to establish deliberate indifference to serious medical needs.  See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim," Franklin v. Oregon, 662 F.2d 1337,

1344 (9th Cir. 1981) (internal citation omitted), and a difference of opinion between medical personnel regarding treatment does not amount to deliberate indifference. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). To prevail, a plaintiff must set forth admissible evidence showing "that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to [his] health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986) (internal citations omitted).

### 1.    **Defendants' Position**

Defendants argue that they did not act with deliberate indifference, and the psychiatric care they provided was not medically unacceptable under the circumstances. Defendants offer as evidence the Undisputed Facts ("UF") and the declarations of defendant Juarez, defendant Villa, and Dr. R. Barda, who is not a defendant. Dr. R. Barda earned his Medical Doctorate in 1992 and has worked as a psychiatrist since 1998, has been employed as a contract psychiatrist for the CDCR at CSP since 2007, and has treated Plaintiff. (Barda Decl., Doc. 141-1, ¶¶1, 11.)

### a.    **Medically Unacceptable Treatment**

Defendants argue that Plaintiff has no evidence that the medical treatment Defendants provided, including the discontinuation of Ritalin and the subsequent treatment provided for his symptoms of hyperactivity and distractibility, was not based on sound medical judgment and was not medically unacceptable under the circumstances of his case.

Defendants present evidence that their determinations about Plaintiff's treatment were based on the following factors which, in Dr. Barda's expert opinion, were medically appropriate: (1) doctors were unable to verify that Plaintiff had actually been diagnosed with ADHD; (2) Plaintiff had other medical and psychological conditions, including Vlasich's history of drug use, which could have caused his symptoms; (3) there is an increased risk involved when prescribing stimulant medications to persons, such as Plaintiff, with a history of drug abuse; and (4) in light of Vlasich's incarceration, history of drug abuse, and his level of functioning, the symptoms of which he complains are not clinically significant impairments that outweigh the risks of treatment with a stimulant medication. UF 31; Barda Decl. Doc. 141-1, ¶¶16-18.

Defendants argue that neither the deficiencies in care of which Plaintiff complains, or any purported statement made by Defendants concerning the purported policy prohibiting stimulant medications – nor Plaintiff's lay opinion as to his psychiatric needs and the quality of treatment he was provided – are sufficient to bring into dispute Defendants' evidence that Plaintiff received adequate treatment for the symptoms of which he complained while he was under their care.

Defendants present evidence that the medications prescribed by Defendants were safer than Ritalin and approved to treat Plaintiff's symptoms.  Strattera is FDA-approved to treat ADHD and can be used to treat symptoms of hyperactivity and distractibility.  UF 13.  Effexor, Prozac, and Wellbutrin are used in their "off label" capacity to treat ADHD and also can be used to treat symptoms of hyperactivity and distractibility.  UF 14.  Strattera, Effexor, Prozac, and Wellbutrin are not stimulants and therefore pose less threat of addiction.  UF 15.

Defendants present evidence that Juarez's decisions in prescribing medications other than Ritalin were based on sound medical judgment.  In late July 2005, Juarez was notified that Vlasich was requesting treatment for his symptoms of hyperactivity and distractibility, and although Juarez was not then his treating psychiatrist, Juarez prescribed Strattera to Vlasich in his capacity as the Acting Chief Psychiatrist at CSP-Corcoran.  UF 42.  Juarez was not aware of any substantial risk of serious harm to Vlasich's health created by his treatment with Strattera.  UF 43.  In October 2005, Juarez was notified that Vlasich was requesting treatment for his symptoms of hyperactivity and distractibility, and although Juarez still was not his treating psychiatrist, Juarez prescribed Effexor to Vlasich in his capacity as the Acting Chief Psychiatrist at CSP-Corcoran.  UF 46.  Juarez was not aware of any substantial risk of serious harm to Vlasich's health created by his treatment with Effexor. UF 47.

### b.    <u>Deliberate Indifference</u>

Defendants argue that Plaintiff cannot prove deliberate indifference because the discontinuation of his treatment with Ritalin, and subsequent denial of stimulant medications, did not create a significant risk to his health.

Defendants assert that Plaintiff's incarceration, history of drug use, level of functioning, and the symptoms of which he complained, did not justify treatment with a stimulant medication.

Defendants were unable to confirm that Vlasich was actually diagnosed with ADHD, or to confirm that the symptoms Vlasich claimed actually resulted from ADHD.  UF 21, 24, 26.   Villa was unable to confirm that Vlasich had significant problems programming that would justify treatment with Ritalin.  UF 31.  Juarez based his decision to discontinue Plaintiff's Ritalin prescription, in part, on information Juarez received regarding Vlasich's history of drug abuse.  Id. There is an increased risk involved when prescribing Ritalin or any other stimulant medication to individuals with a history of drug abuse.  UF 9.  Plaintiff has a history of drug use, ending only with his incarceration, which included using drugs until they "pretty much fried [his] brain," caused him to stutter and lose things.  UF 16.  Defendants contend that the course of treatment provided to Plaintiff was a reasoned medical decision made because the risks of continuing to prescribe Ritalin outweighed the benefits.  Defendants maintain they did not disregard any known risk to Plaintiff at any time when they were responsible for his treatment.  Defendants recommended against the continued prescription of Ritalin to Vlasich because of the potential for abuse and the lack of findings to justify its continued use in his case.  UF 31.  In June 2005, Dr. Villa began tapering down Vlasich's Ritalin prescription.  UF 36.  Dr. Juarez prescribed Strattera to Plaintiff, maintaining that he was not aware of any substantial risk of serious harm to Vlasich's health created by his treatment with Strattera. UF 42, 43.  Vlasich concedes that Juarez did not prescribe Strattera in conscious disregard of his health.  UF 44.  Dr. Juarez later prescribed Effexor for Plaintiff, maintaining he was not aware of any substantial risk of serious harm to Vlasich's health created by his treatment with Effexor. UF 46, 47.

       The Court finds that Defendants have met their initial burden of informing the Court of the basis for their motion, and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact.  The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist.  See  Matsushita, 475 U.S. at 586. As stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of his

///

contention that the dispute exists.  Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11; <u>First Nat'l Bank</u>, 391 U.S. at 289; <u>Strong</u>, 474 F.2d at 749.

"Deliberate indifference is a high legal standard."  <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1060 (9th Cir. 2004).  "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'"  <u>Id</u>. at 1057 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).  "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'"  <u>Id</u>. (quoting <u>Gibson v. County of Washoe, Nevada</u>, 290 F.3d 1175, 1188 (9th Cir. 2002)).

### 2.   Discussion

Turning to Plaintiff's position, the Court looks to Plaintiff's opposition and verified Complaint.[11] [12]  (Docs. 1, 146.)  The Court considers Plaintiff's medical records to the extent that the records are clear and speak for themselves.  However, to the extent that interpretation of the records by an expert is necessary, Plaintiff's lay opinions may not be considered.

The parties do not dispute that Plaintiff reported suffering from symptoms of hyperactivity and distractibility which resulted in treatment by psychiatrists with medications, including Ritalin.

---

[11]Defendants argue that the Court should reject Plaintiff's opposition as procedurally defective, because Plaintiff failed to comply with Local Rule 260(b) which requires the opposing party to "reproduce the itemized facts in the Statement of Undisputed Facts," "admit those facts that are undisputed," "deny those [facts] that are disputed," "includ[e] with each denial a citation," and "fil[e] with the Clerk [] all evidentiary documents cited in the moving papers."  L.R. 260(b).  The Court recognizes that Plaintiff failed to comply with every instruction of the federal and local rules.  However, both Plaintiff and Defendants shall be heard by the Court on this dispositive matter.  "There is a 'well established' principle that '[d]istrict courts have inherent power to control their dockets.'"  <u>United States v. W. R. Grace</u>, 526 F.3d 499, 509 (9th Cir. 2008) (quoting <u>Atchison, Topeka & Santa Fe Ry. Co. v. Hercules Inc.</u>, 146 F.3d 1071, 1074 (9th Cir. 1998) (alteration in original) (internal quotation marks omitted).

[12]A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.  <u>McElyea</u>, 833 F.2d at 197-98; <u>Lew</u>, 754 F.2d at 1423; Fed. R. Civ. P. 56(e).  Therefore, the Court considers Plaintiff's verified Complaint to be an affidavit in opposition of the motion for summary judgment.  Plaintiff's opposition is not verified, and Plaintiff's declaration in support of the opposition is not dated or signed and therefore is not admissible evidence.  Plaintiff also refers to Exhibits A-X which are not attached to Plaintiff's opposition or found elsewhere on the Court's record and therefore are not considered.  The Court notes that Plaintiff has combined his opposition to the instant motion and his opposition to another motion for summary judgment in this action (filed January 25, 2010 by defendant Dr. Fishback and granted by the Court on October 29, 2010) into one handwritten eighty-seven-page document, making it difficult for the Court to decipher which facts and arguments are applicable to each of the two individual motions.

1   Plaintiff reports that he was diagnosed with ADD as a child and was prescribed Ritalin for ADHD

2   symptoms. (Compl., Doc. 1 ¶9.)[13]  Plaintiff states that he has been in the CCCMS [mental health]

3   program at CSP since 1996. (Id. at ¶11.) Plaintiff also states that on July 13, 2001, he was

4   diagnosed with adult ADHD and was prescribed Ritalin, that eight different psychologists,

5   including Dr. Villa and Dr. Juarez, diagnosed him with ADHD and prescribed Ritalin, and that an

6   additional four psychologists also diagnosed him with ADHD. (Id. at ¶¶ 12-14.) Although

7   Defendants claim they never actually diagnosed Plaintiff with ADHD or saw any evidence that

8   Plaintiff was actually diagnosed with ADD or ADHD as a child or adult, the Court finds that

9   Plaintiff's assertion that he was diagnosed with ADD and ADHD and has been treated with

10  Ritalin since childhood reflects personal knowledge of his medical history.  Evidence of

11  diagnostic tests are not required to determine whether Plaintiff had a serious medical need.

12  Defendants treated Plaintiff as if he had ADHD when they used medications for Plaintiff which

13  were all either FDA-approved or used in their "off label" capacity to treat ADHD.   Defendants

14  contend there is no objective test available to diagnose ADHD, which would make it impossible

15  for Plaintiff to prove he has ADHD.  Whether or not Plaintiff has ADHD, he has demonstrated

16  that he suffered from serious symptoms which Defendants recognized needed evaluation and

17  treatment. Thus, Plaintiff's condition constituted a serious medical need as defined under the two-

18  part test for deliberate indifference.

19      However, the Court finds that Plaintiff has not set forth any admissible evidence showing

20  that Defendants were deliberately indifferent to his serious medical needs.  Plaintiff claims that

21  Defendants consciously disregarded his medical needs because they stopped his Ritalin

22  prescription only because of a directive from Dr. T. Fishback, the CDCR's Chief Psychiatrist in

23  Sacramento, proscribing the use of Ritalin to treat ADHD.  However, Plaintiff's own account of

24  his treatment shows that Plaintiff received regular treatment for his symptoms.  Plaintiff alleges

25  that on June 9, 2005, Dr. Villa told him that he had to discontinue Plaintiff's treatment with

26  Ritalin because "Sacramento" issued a memo which stated that ADHD would not be treated

27

28      [13]When the pagination of a party's document differs from the pagination used by the Court's electronic filing system, the Court uses the pagination of the Court's electronic filing system.

anymore, and that there was no other medication available for him.  (Compl., Doc. 1 at 5 ¶15.)

Dr. Villa then gradually decreased Plaintiff's dose of Ritalin until the medication was completely

stopped in July 2005.  Id.  On July 4, 2005, Dr. Knight reinstated Plaintiff's Ritalin prescription

after Plaintiff filed an ADA request form, and Dr. Knight told Plaintiff it was not true that

"Sacramento" had issued a memo proscribing treatment with Ritalin for ADHD.  (Id. at 5 ¶17.)

On July 14, 2005, Dr. Villa discontinued the Ritalin prescription Dr. Knight had written for

Plaintiff.  (Id. at 5 ¶18.)  On July 15, 2005, Plaintiff complained to psychologist Puljol about Dr.

Villa discontinuing the prescription, and Puljol told Plaintiff that Dr. Juarez told her that

"Sacramento" had sent a memo proscribing the use of Ritalin.  (Id. at 6 ¶¶19, 20.)  Shortly

thereafter, Dr. Juarez prescribed the medication Strattera for Plaintiff's ADHD symptoms.  (Id. at

7 ¶21.)   Plaintiff had serious side effects from Strattera and the prescription was discontinued on

August 12, 2005.  (Id. at 8 ¶24.)  On September 3, 2005, Dr. Juarez interviewed Plaintiff and

prescribed the medication Effexor to treat Plaintiff's depression and anxiety. (Id. at 10 ¶27.)  It is

undisputed that Vlasich discontinued Effexor on his own and cannot recall telling either Juarez or

Villa that he had discontinued his treatment.  UF 48, 49.  It is also undisputed that after Plaintiff's

treatment with Effexor was discontinued, Dr. Juarez was informed that he had been offered

Wellbutrin to treat his symptoms, but he declined the treatment and insisted on receiving a

stimulant medication.  UF 50.  Plaintiff was prescribed Prozac on October 25, 2005.  UF 51.

Plaintiff's account shows no evidence that Defendants disregarded his complaints about

symptoms or failed to treat him.  Defendants met with Plaintiff, evaluated his symptoms, and

prescribed medications to treat his symptoms.  The parties dispute whether a policy actually

existed proscribing the use of Ritalin to treat ADHD and whether Defendants based their

decisions about Plaintiff's treatment, in part, on such a policy.  Even if Defendants reacted to such

a policy, it is undisputed that Defendants' decisions about Plaintiff's treatment were based in part

on other factors including his medical history, his other medical and psychological conditions, the

increased risk of prescribing stimulant medications to persons with a history of drug abuse, and

whether Plaintiff's symptoms were clinically significant impairments outweighing the risks of

///

1  treatment with a stimulant medication. UF 31.  Based on this record, Plaintiff has not provided

2  evidence that Defendants consciously disregarded Plaintiff's medical needs.

3        Defendants argue that Plaintiff is able to function well even without Ritalin, but Plaintiff

4  claims he suffered from serious symptoms because his Ritalin prescription was stopped.  He now

5  takes Prozac for depression and anxiety, which Plaintiff contends was caused by the lies, deceit

6  and total lack of any treatment for his ADHD.  (Id. at 10 ¶29.)  As a result of the discontinuation

7  of Ritalin, Plaintiff claims he has become dysfunctional and has severe problems with

8  concentration, thought processes, memory, learning, reading, sleeping, watching television, and

9  interacting with others.  (Id. at 11 ¶31.)  Plaintiff claims he has trouble caring for himself because

10  he forgets to brush his teeth, wash his clothes, go to the bathroom, and write to his family and

11  friends.  (Id.)  Plaintiff believes the stress of stopping Ritalin caused him to develop painful

12  canker sores in his mouth.  (Id. at 11 ¶32.)  Plaintiff provides evidence that James Mickey, another

13  inmate, who lived with him from about 2003 to 2010, observed that Plaintiff "became another

14  person" after ceasing to take Ritalin, becoming argumentative, forgetful, and hyperactive.

15  (Declaration of James Mickey ("Mickey Decl.") in support of Opposition, Doc. 146 at 21.)  Also,

16  Plaintiff needed other prisoners to assist him with organizing and preparing the present

17  Complaint.  (Compl. at 12 ¶35.)  Defendants contend there is no evidence of harm to Plaintiff

18  from stopping Ritalin, because Plaintiff has admitted he is able to participate in day-to-day

19  activities since stopping Ritalin.  (Vlasich Depo. at 181:23-184:2, 184:11-185:20.)  The Court

20  finds that evidence of Plaintiff's participation in activities does not prove that Plaintiff is able to

21  *fully* participate in activities.   However, Plaintiff's assertion as a layperson that such symptoms

22  resulted from the discontinuation of Ritalin is not admissible evidence.  Also, the fact that

23  Plaintiff has other medical conditions and takes other medications makes it more probable that

24  Plaintiff's symptoms have other causes besides the absence of Ritalin in Plaintiff's system.[14]

25  Therefore, the Court finds no admissible evidence that Plaintiff was harmed by the

26  discontinuation of Ritalin.

27

28      [14]Plaintiff also has Hepatitis C.  (Vlasich Depo. at 173:12-15.)  Plaintiff also suffers from anxiety and depression.  (Compl. at 10 ¶¶27, 29.)

Plaintiff has not shown more than a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment.  Plaintiff has not provided any evidence that Defendants chose to stop his access to Ritalin in contradiction to established medical practice. Defendants have provided evidence that their chosen course of treatment was medically acceptable under the circumstances.  As a layman, Plaintiff is not qualified to offer an opinion about whether Ritalin is a better treatment for him, and a prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference. Sanchez, 891 F.2d at 242.

Based on the foregoing, the Court finds that Plaintiff has not provided admissible evidence that Defendants acted, or failed to act, with deliberate indifference to his serious medical need. Thus, the Court finds that Plaintiff has not established the existence of triable issues of material fact as to his Eighth Amendment medical care claim against Defendants, and Defendants are entitled to judgment as a matter of law.

### C.      Injunctive Relief

Defendants argue that Plaintiff's claim for injunctive relief fails.  In light of the Court's ruling that Defendants are entitled to summary judgment, the issue of Plaintiff's claim for injunctive relief shall not be addressed.

### D.      Qualified Immunity

Defendants argue that they are entitled to qualified immunity.  Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982).  "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 129 S.Ct. 808, 815 (2009), and protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986).

///

In resolving a claim of qualified immunity, courts must determine whether, taken in the light most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001); McSherry v. City of Long Beach, 560 F.3d 1125, 1129-30 (9th Cir. 2009). While often beneficial to address in that order, courts have discretion to address the two-step inquiry in the order they deem most suitable under the circumstances. Pearson, 129 S.Ct. at 818 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); McSherry, 560 F.3d at 1130.

As discussed above, the Court finds that Defendants did not violate Plaintiff's constitutional rights. Therefore, the issue of qualified immunity shall not be addressed.

## VI.    CONCLUSION AND RECOMMENDATIONS

The Court concludes that Defendants Juarez and Villa are entitled to judgment as a matter of law because Plaintiff has not established the existence of triable issues of material fact as to his Eighth Amendment medical care claim against them. Accordingly, the Court RECOMMENDS that Defendants' motion for summary adjudication of the claims against them be GRANTED.

These Findings and Recommendations shall be submitted to the United States District Court Judge assigned to this action pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B). Within **thirty (30) days** after being served with a copy of these Findings and Recommendations, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the order of the district court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:    **February 10, 2011**                    _____/s/ **Gary S. Austin**_____
                                        UNITED STATES MAGISTRATE JUDGE